Good morning, Your Honor. Your Honors, may it please the Court, I'm Michael Scheffler, and as my colleague, Ms. Crowther, indicated, I'm representing the Joneses as well, this time seeking a reversal of the District Court's order granting summary judgment. We are on de novo review. As I think we've already seen, this case presents very difficult, complicated issues. It presents a very difficult, complicated balancing between family rights, which are fundamental rights to privacy and integrity, on the one hand, and certainly the equally, perhaps, important rights of protecting children, of investigating crimes. But before we get to that point, we need to know what the facts are. And that's where the District Court erred in this case. It erred because it didn't follow what Rule 56 and this Court's law regarding summary judgment requires. It ignored the Joneses' evidence and, therefore, ignored disputed factual issues. It failed to grant the Joneses the benefits of the evidence that they submitted with respect to the inferences that they put forward. Why don't we go right into that then? Thank you, Your Honor. I appreciate the question. Where was the error? Well, Your Honor, I think when we start, for example, I think we go right to the heart of the matter. We look at the basis for the March 7th hospital hold. According to the District Court, the basis for the March 7th hospital hold was that social worker Debra Ramirez had spoken with hospital social worker Stephen Thomas and had learned that the scan team's test had been completed. And that they had found that there was a second rib injury, a rib injury that had occurred after baby George's first visit to the hospital. And I saw it. And it looks like ultimately what persuaded the social workers there was Dr. Kim saying that there were still concerning injuries to the baby. But I don't know who Dr. Kim is. I looked at the record and I can't determine who Dr. Kim is. Yes, Your Honor. Dr. Kim, as I understand, is another member of the scan team, another doctor on the scan team. Dr. Wong was... Is that in the record? Is that anywhere in the record? You know, Your Honor, I know certainly it's in the District Court's order. It's in the order, but it's not in the record. Yeah, I don't have a cite to the record for that. Okay. But that's undisputed that Dr. Kim is a scan doctor. I believe that's correct. Is there any way? Because otherwise we have to go outside the record. We shouldn't speculate on whether she is or is not, or he is or is not. Well, let's wait. Let's wait. We can get... Yeah. We've got the counsel coming. She can tell us. But what Dr. Thomas, excuse me, Social Worker Thomas tells us in his declaration, which is at excerpts of record pages 211 and 212, is he says that on that same day, on March 7th, that the scan team's tests were not completed. That there was not a conclusion at that time. There was not a determination of whether the rib injuries were in fact new or whether they were just newly discovered. So here we're going to the really, it's a very classic factual dispute. Dr. Ramirez says, I spoke to Dr. Social Worker Thomas. Excuse me, Social Worker Ramirez says that she spoke to Social Worker Thomas and she says that he, that Mr. Thomas said, we're done, the injuries are new. Thomas says, no, we aren't done, we weren't done at that time, the injuries, we don't know if the injuries are new. The next day, March 8th, when the second hospital holds issues, we have another very classic factual dispute. And this one is really much more direct even. In this case, with respect to the district court's finding on the March 8th hospital hold, the district court says that the supervising social worker, Yolanda Johnson, spoke with Dr. Wong, and social worker Shawn Rivas also spoke with Dr. Wong, and that they came away from those conversations with the understanding that Dr. Wong had concluded that the injuries were new. And they heard it straight from Dr. Wong, straight, excuse the saying, but straight from the horse's mouth. And then here, we have, here we have Dr. Wong's own testimony, her own deposition testimony, where she says in the conversation, the very same conversation that she had with Mr. Rivas, she says, I didn't, I told him that they were not new, that the injuries were not new. But didn't she also say that they were still highly concerning? And if she said that they were still highly concerning, is that not enough? It's not enough, Your Honor, because what we have then is that we have a period of three days where the baby has stayed in the hospital and gone through tests, the social workers have been involved, and so the showing of exigency is really going down at that point. As time goes by, the cases, the Wallace case, the Rogers case, the Mabe case, they all focus in terms of the issue of exigency on how much time has elapsed from the social workers' involvement and beginning their investigation to when they seize the child. So here, the time is ticking by. And in fact, you know, the district court, taking away from the district court's opinion, we have this view that I think Judge McNamee said this crescendo, and we have this increasing ticking every day of more information supporting a child abuse finding. Well, if you believe the Jones's evidence, and I think that that's the more credible evidence, and I can explain why, we actually have the opposite. As the days go by, we have more evidence showing that the rib injuries aren't new, that there's only been one injury, and that that injury occurred on the 24th when Jill Jones and Michael Jones rushed their son to the hospital. So what if it's unclear whether they're new? That's, you know, I think if it's unclear whether it's new, that's what will be sorted out at trial, and that's the error that the district court made here, was deciding that they were new. If it's unclear whether they're new, how can we say that it was unreasonable for what the social workers did? Well, first of all, if we take the Jones's evidence, it's not unclear that it was new. The Jones's evidence is it's clear it was not new. Dr. Wong says to Rivas, the injury did not, it is not a new injury. It was a newly discovered injury. So it's not that Rivas would have gone away from that conversation, if you believe the Jones's evidence, thinking, gosh, we still don't know, it's still up in the air. He would have walked away from that conversation with Dr. Wong, hearing, oh, that issue is foreclosed, that issue is resolved. But what about the you should keep playing ball comment on March the 5th? Was that really a seizure? Yes, Your Honor, it was. And let me just back up. Why? It was a seizure, Your Honor, because it was evidence of a seizure. What we have, this is another fact that needs to go to a jury, another fact that needs to be tried. But what we have is a situation where the determination of whether there's been a seizure is based on the totality of the circumstances. And so, you know, when you look at United States v. Washington, for example, a case we cite in our brief, one of the factors to consider is the authoritativeness or the officiousness of the state actor. And in this case, when you take all those facts together, Mr. Revis had assumed control of the situation. Dr. Wong testified that she believed he had assumed control of the situation, that Jones has testified that they believed it. That conversation is certainly enough to support a finding that they had submitted to official authority. Well, that may be, but there's just as much, if you flip that coin, it's advisory, you know, better play ball. It just works out better for everybody all the way around. You can stay here. You can be with your child. We'll have a sitter with us. And maybe it would work out better than going home and then having to run to all these other different clinics and places to have this child looked at. I mean, you can interpret that two different ways, can't you? You can at trial. You can't on summary judgment. Right. And so on summary judgment, the way you interpret that is from the Jones's perspective. Well, that's why I worry. I mean, I've heard you say there's two sets of facts, and the court made a mistake in the facts, and then I hear you try to put these facts together. It seems to me your argument would be we can't even talk about what their facts are. We have to take what the Jones's facts are. That's what I'm saying, Your Honor, and I apologize if I haven't made that clear. But, in fact, even with what the Jones's facts are, they can't really suppose facts from conversations they were not involved with, can we? Yes. Except as to what they can get from the depositions. I mean, my worry about your argument is I've got to read the depositions, so I start reading, and I'm trying to figure out why in those depositions the facts you say the Jones's can allege are there. I mean, just because you want to say they're there doesn't mean they're there. I have to find facts which the Jones's would know. There's no question. But if there are no facts to support the conclusory allegations the Jones's make, then I don't know that I have to give that credence, do I? Well, Your Honor, the facts are the Jones's deposit clearly states that Mr. Revis told Michael Jones if you try to take the child, he will be detained. I understand that, and going to the seizure question, I can take that. Then I take what the district judge said about that, which is there's no constitutional violation. He was just being perfectly straight with the people, saying, if you do that, I might have to make a decision I don't otherwise want to make. Well, Your Honor, I think that's exactly what the county will argue at trial. Well, I think that's exactly what the county argued here and what the district court had to determine. But I think the problem is that that is granting an inference in favor. That is spinning the evidence, the fact from these conversations, spinning it in favor of the county, whereas we are supposed to be spinning it in favor of the Jones's. That's the procedural posture. How about Mr. Sege, the TCEGGE? Sege. Sege, okay. It's not clear to me what basis Sege had to go against the team recommendation, but what is the stated reason? Do you know? Well, Your Honor. This concerning injuries to the child? That's what I understand, that at that point there was some discussion about returning George back to the family, and he ultimately decided no. So why was that unreasonable? Because, again, Your Honor, we're back in the same boat. Now we're four days past, and still nobody from the county has sought a warrant or a court order to take this child from the Jones's. And the doctor is still sending the same signals or statements, even, that those rib fractures and the whole situation is very suspicious and disconcerting, so they have to make a call whether or not to continue the hold or try to do whatever they can. I'm just trying to figure out why it was unreasonable based on the information that Sege had. Because, again, if we look at the course of the information over this four- to five-day period, whereas on March 5th at the very beginning we have maybe this rib injury is a new injury, by March 9th we know it's not. So he actually has more information disproving of this. It's clear it's not by March 9th based on? Dr. Wong's testimony where she says she told Revis that it was not a new injury. And if I could, Your Honor, I have about a minute and a half left. I'd like to be the first to successfully reserve my time. Good morning, Your Honors, and may it please the Court, Melinda Ebelhere appearing on behalf of the county and the four social worker defendants who are individuals who are also appellees in this court. Quickly, just to the question about Dr. Kim, I tried to see what I could find in the record while I was still paying attention to the decision. And the best I can figure is at excerpts of record, page 9 is part of the district court's decision in the matter, and he references the Dr. Kim comment, but he references it as it having been submitted in support of Dr. Wong's motion for summary judgment. And they were heard concurrently, and, of course, they were coordinated by this court as well. So I think there's no actual dispute, and I think it's probably in the other record, which I actually don't have because it wasn't served on me because I'm not part of that appeal. I appreciate your work on that at this point. I was going to give you more time after all your arguments so you could listen, but thank you very much. Go ahead. Thank you, Your Honor. You know, I'd like to go back to Mila, too, of course, because I think there's two comments in there that are very much on point here, and one is the quote from a Seventh Circuit case adapted by the Ninth Circuit, which says, When a child's safety is threatened, that is justification enough for action first and hearing afterward. And the other holding out of Mueller, which says that the detective, who is not a medical professional, was in no position to second-guess the information that he was getting from the medical professional or to assume with hindsight that the doctor was wrong. And that would be manifestly inappropriate for the non-medical professional, the legal professional, or the law enforcement professional, to make an assumption. So I got the feeling for listening to counsel, and that's what I think you have to really focus on, that he doesn't even dispute that, either of those statements. What he's saying is what the district court did in this particular matter is rather than use the facts that the Joneses have affied in this particular situation, the district court made fact-finding on summary judgment and did not use their facts, but instead used facts that were not appropriate in making this ruling. Well, obviously, Your Honor, I disagree with that assertion. Well, I want you to address that. And I think that if you distill the necessary, you distill it down to the basic necessary facts and remove all the extraneous facts, and what you have is a child who presented with an injury that we know statistically 95% of the time is the result of child abuse. That's the number one. Number two, we have information originally suggesting that this rib fracture was a new fracture. We also have doctors telling the social workers that the mother's story is suspicious. These sorts of injuries don't happen this way generally. We didn't see a rib fracture on the first one that we see on the second one. Those are the basic facts. There's a lot of gloss in there as well, but those are facts. Those are undisputed facts. As you say, as a district judge, I'm confronted with facts all day long in motions for summary judgment. But not every fact cited by a party is a material fact to the decision-making. Do you agree with that? I absolutely agree with that, Your Honor. And not only that, I try and hammer it into the young associates that they shouldn't be putting in all the extra facts that will ultimately put me here in front of the court trying to explain why some of them are not critical facts. The critical facts that he's alleged, were they critical to the judge's decision or not? Your Honor, I think that, no, I don't think they all were. I think the critical facts are the ones that I just said in front of this court, which are that the baby was injured, that it was highly suspicious for child abuse, and that I have reasonable social workers who are relying on information. They are being fed by the medical professionals who say, there's a problem here, there's a real problem here, and we're concerned about it. Yes, ma'am. And what if there's a dispute as to whether or not the doctors really communicated that to them, whether or not, you know, we just heard that there's possibly a dispute on whether or not the doctors said those injuries were new or those were from the prior, that they'd been there from the original injury that occurred? Your Honor, even if that is true, we are still looking at a situation where we don't know what caused the original injury. We know that the mother has said, well, it was a fall down the stairs. We know there was concern that that was suspicious, that that wasn't what really happened. We know that there was concern, we find it referred to in that same declaration of the hospital social worker, Mr. Thomas, which is in the record beginning at page 211, that there is concern about the behavior of the father toward the mother, as to whether there's really something going on here in the family dynamics that is causing a problem with the newborn. Here's the troubling factor that I see, is they meet, whether it's newly discovered versus new injuries, whatever they found about these new ribs, five of them on one side of a child three months old, has got to be dramatically troubling to someone. And trying to figure out what do you do under those circumstances, because it's just like when you hit yourself a lot of times, the black and blue mark doesn't come up for 48 hours later, 24 hours, whatever it is. So that's the problem you get in a lot of the beating cases that I see. The assaults, well, they weren't black and blue in the emergency room, well, three days later they are. But that's serious when they're newly discovered in a three-month-old child, who obviously cannot talk, walk, or do anything else, but would appear to be in severe distress. And, Your Honor, whether or not, and really this goes back to Her Honor's question as well, whether or not that rib fracture is a new fracture, meaning that there were two instances supposedly of child abuse, or whether it's simply one that they missed the first time around, it's still consistent with child abuse. It's still 95% of the time going to be consistent with child abuse and require more investigation, require more hard looking at to see whether or not, in fact, it is an issue. And now we come into the situation where we're talking about, counsel talked about exigency that was a discussion here. Well, there wasn't necessarily an exigency in the first couple of days that the child was in the hospital, because, for whatever reason, the parents weren't trying to leave. We know because of the discussions that we've had, the record here and the previous discussion about Dr. Wong, that when we come to Sunday night, Monday morning, there's not a medical reason to keep the child in the hospital anymore. We're either going to have to fish or cut bait. We have to either let the child go, or we have to do something to keep the child from leaving. Now, the social workers find out from the doctors, we have no further medical reason to keep the child here. Now we have an exigent circumstance that did not exist prior to that, because the parents can walk out of the hospital at any time with that child, and it's not against medical advice, it's nothing like that. All the way up until that point, we have parents who are playing ball with the department. We have a mother who is intimately involved with the decision-making processes generally in the department. She knows how it works. She's part of the county counsel's office that was assigned to the DCFS there. So this is a sophisticated family in terms of knowing what their legal rights are, and they're going to potentially walk home with their child. Now all of a sudden we have to do something to keep that from happening. It wasn't an issue before when the child was still having testing, parents were still sending to that testing. There's no more testing to be had. So that distinguishes this case from Rogers and those other cases where the exigency is like, wait a minute, you knew this kid was in trouble five days ago and you didn't do anything, and now all of a sudden you're claiming you had to barge in there and take the kid out. So explain to me the procedure here. So do social workers typically get a court order or they don't? They end up just trying to finesse the situation with the parents? Your Honor, I don't know that there is a typical situation. I think any time that you can work out a voluntary agreement with a parent, particularly in a situation where you're in a protected setting in the hospital like that, that's got to be an advantage. And also you're dealing with somebody who, again, is part of the system and who knows how things work. And I think they're more common in other districts. The 6th and the 7th District have dealt with what they call safety plans, voluntary agreements between parents and the social workers that avoid going to court. A lot of times parents don't want to have to go to court. If you've had a cooperative parent, you can have it. So what happened here? The court order was never? Your Honor, what happened here is because of the social workers' belief that there was an exigent circumstance, that if the child was allowed to go home with the parent, the child would be subject to imminent danger of further child abuse, they exercised the authority to issue a hospital hold without a warrant. When that happens, under California law, the welfare and institution codes are very specific and the rules of court are very specific. Now, once that hold is issued within 48 hours of judicial days, not of court days, the department must file a petition with the juvenile court. And by the end of the next judicial day, there must be a detention hearing in the juvenile court, and that's in the welfare and institution codes. Did that happen here? That did happen here, Your Honor. When was that filed? The petition is not in the record. We know that the juvenile detention hearing was heard, began on, I believe it was Thursday. I have my timeline here. It began on Thursday. This in itself was an unusual situation because it went over two days. The parents, both attorneys, came in with an attorney. They presented evidence, arguments, witnesses. So the official social worker hold occurred on which day, the hospital hold? There is some dispute in the record about that. It may have happened on Sunday or it may have happened on Monday. March, which day? Sunday, March 7, or Monday, March 8. Probably Sunday, March 7, which is not a judicial day. So you have two days to file a petition and another day for a hearing, and that's subject, obviously, to continuances and things. Once a petition is filed, that puts it within the jurisdiction of the juvenile court. At that point, it's out of the DCFS hands. And then they went into the juvenile court, and one fact that counsel actually ---- But you don't know which day was the official hospital hold day. Your Honor, there is evidence in the record that says that there was a hospital hold issued on Sunday the 7th, and that was when the UCLA social worker, Steve Thomas, called the DCFS hotline, and he spoke with Deborah Ramirez. And at that point, Ramirez went and talked to Johnson and other people. Anyway, there was a hold issued. And Thomas's declaration does say that it was faxed over to the hospital, so as far as he knows, it was there. On the next day, on Monday, the DCFS people can't seem to find the paperwork, and so Ms. Johnson wasn't completely clear as to whether or not it had actually been issued, and so they authorized the issuance on Monday. Of another hold, because there's a reference to a hold on the 7th and a hold on the 8th. Well, this is the same hold. It's just it's paperwork, Your Honor. The paperwork, the DCFS people couldn't find the paperwork on the 8th that told them that the hold had, in fact, been issued on the 7th, but we know that the hold was supposed to be on the 7th. We know from Mr. Thomas's declaration that the hospital got the hold. Whatever happened at the fax machine, somebody didn't save a copy, whatever. So they issued another hold. They redid the paperwork. So why on 9th was there another hold? Why did Segei have to make any kind of decision on the 9th? Your Honor, what happens there is now they go to a team decision meeting to decide to see if they can come to an agreement as to what's going to happen with the child pending the final determination of the juvenile court. And that team decision-making brings in the parents and everybody else. How are we going to place this child? What are we going to do? What plan are we going to make at that time? And the parents were involved in that. Revis Johnson was involved in that. And there was a recommendation or there were a number of recommendations made, but Segei Well, there was a recommendation to go ahead and release the child to the parents. To the parents. And then Segei, the administrator. Segei has the authority to do that, and I'm not sure if this is in the records. I don't know if I want to say it. I have to go back and check. I believe his concern was the evidence, whether it was slight or otherwise, there were two things going. There was concern about whether or not the child would be protected in the home because there was this concern about the interactions between the parents, that the father seemed to be controlling, angry, yelling, whatever, and the fact that the child could go to the maternal grandparents. So that would be at least a lesser intrusive thing, that it could go to the maternal grandparents during that period of time. And so that is, in fact, what happened. Let's go back a little bit because at this point there's still a lot of fluidity to the whole situation about what's going to happen, who's going to do what. They're having these meetings and everything, and when you have that hearing and the warrant is served and they have the hearing, that's when the due process, another phase of the due process begins for the parents, right? So they have to have their right in court and present their theories. But up to that point, you're still dealing with an emergency situation as to this child. Absolutely, Your Honor, and you're dealing with a lot of unknowns and you are dealing with a pre-verbal young child who can't protect himself and can't tell you what's happening. So are the holds only good for 24 hours? I can't, I can't, I'm struggling. No, Your Honor, and the hold is essentially. The ninth, excuse me. And then when was the hearing within the 48 hours after that? Okay, I'm not clear in my communicating. Let me try again then, Your Honor, I apologize. The hospital hold is essentially in place of a warrant. It's like a warrantless arrest, I guess. I'm not a criminal lawyer, but I tried to learn a little bit about that for this case. And so once you've made a warrantless arrest, you don't go and get a warrant for the arrest. You have an arrest and now you've got to justify that arrest. Okay, so here we have a hold that is justified or is authorized under California law. Okay, and I. You have a hold. It looks like we have three holds. Your Honor, I believe we actually only have two and it's really only one that's just paperwork issues. Okay, that that hold was issued on the 7th. That's Sunday. Okay, and the hold on the 8th, Your Honor, is simply, again, it was like belts and suspenders. Okay, I'm not sure that hold's been issued. It was supposed to be issued. Let's just do the paperwork and make sure it's clear so that there's no question that there's a hold on this child and this child's not going to be going home with Mom and Dad until the juvenile court says that's okay for that to happen. Okay, once that happens, then there's no warrant at that point. That triggers the Welfare and Institution Code procedure that says you have, the DCFS must file a petition within 48 hours, and then there must be a judicial hearing after that. That's within, obviously, the purview of the juvenile court where they're sending their hearings. The DCFS can't tell the court what its calendar is going to be. But here's the petition. Here's what we're going to do. Thank you. Yes. Okay. All right, thank you. I think we've got your argument well in mind. Thank you. Thank you, Your Honor. I think you have a minute and a half. You saved it. It wasn't easy, Your Honor. Your Honor, just to pick up right where my friend left off, a hold is not the same as a warrant. Obviously, a warrant goes to a neutral, detached judge. A hold is issued solely by DCFS. It's something less than a warrant of arrest, right? Yes, Your Honor, absolutely, a warrant still goes to a judge. Again, it's one of these things they're trying to fuse the situation to get to the merits quickly, but it doesn't involve in custody by having your parents arrested. No, Your Honor, I would disagree. I don't think it's to try to get to the merits. I think it's – I don't think that it does that any different than a warrant would do. I'm saying to get in front of an evaluator, a judge, or a neutral person for these hearings. Yes, but it's reserved for only cases where there is exigent circumstances. It's not a substitute for a warrant. It's not you have a choice. It's not equal to probable cause. To get the hospital hold, you need probable cause plus exigent circumstances. And so there is a substantial difference. They got one, right? I'm sorry? They got one, correct? A warrant? Yes. No. Didn't they get the hold? They issued the hold, yes. And as Judge Murguia was wondering, they did issue two separate holds. And, in fact, they did two different analysis. It wasn't just they went in on Monday after the first one issued on March 7th. They didn't just, on March 8th, issue the same one, change the date. They actually spoke with Dr. Wong. And that's when Dr. Wong told them, and I want to give the site that's on ER 178 in Volume 2. That's when Dr. Wong told them, and the question is, did you tell Mr. Rivas that on March 8th that it was now your opinion that there had not been an additional event since G.J.'s discharge on February 26th? I provided him with all the relevant information, says Dr. Wong. Including that? Yes. So on March 8th, before this second hospital hold issues, Dr. Wong has told Mr. Rivas directly the rib injury is not new. So the information that they had been relying on just the day before, if you believe their story, the information they had relied on just the day before is no longer true. But they still issue the hold anyway, even despite that. Okay. Thank you. Thank you, Your Honor. Case 12-56921 is submitted.
judges: McNamee, Smith, Murguia